## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTAWAN ROBLES, *Plaintiff*, v. DISTRICT OF COLUMBIA, *Defendant*. | Civil Action No. 1:21-cv-02568 (CJN) |

## <u>MEMORANDUM OPINION</u>

Antawan Robles is a recent high-school graduate who lives with Attention Deficit Hyperactivity Disorder.  Disagreeing with the decision of a hearing officer regarding certain aspects of his public-school education, he brings this suit under the Individuals with Disabilities Education Act, or "IDEA."  20 U.S.C. § 1400 *et seq.*  Because Robles has failed to demonstrate that the hearing officer erred, the Court will deny his Motion for Summary Judgment, ECF No. 8, and grant the District's Cross-Motion for Summary Judgment, ECF No. 10.

## I. Background

### A.  The IDEA generally

The IDEA was enacted to ensure that all disabled students receive a "free appropriate public education."  20 U.S.C. § 1400(d)(1)(A).  "Commonly referred to by its acronym 'FAPE,' a free appropriate public education is defined as 'special education and related services that' are 'provided at public expense, under public supervision . . .;' and that 'meet the standards of the State educational agency;' as well as 'conform[] with [each disabled student's] individualized education program.' "  *Charles H. v. District of Columbia*, 2021 WL 2946127, at *1 (D.D.C. June 16, 2021) (quoting 20 U.S.C. § 1401(9)) (alterations in original).  "Special education" is defined

1

as "specially designed instruction, at no cost to parents, [that] meet[s] the unique needs of a child with a disability." 20 U.S.C. § 1401(29). "Related services," on the other hand, are defined as "such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education." *Id.* § 1401(26)(A).

"Under [the] IDEA and its implementing regulations, students with disabilities . . . are entitled to receive [a] FAPE through an Individualized Education Program (or IEP)." *Charles H.*, 2021 WL 2946127, at *1 (quoting 20 U.S.C. § 1401(9)(D)). An IEP is a written document that lays out how the student will obtain measurable annual goals and that mandates specific special education and related services that the student must receive. 20 U.S.C. § 1414(d)(1)(A)(i). It is created for each student by a special "IEP Team," consisting of the child's parents, at least one regular-education teacher, at least one special-education teacher, and other specified educational experts. *Id.* § 1414(d)(1)(B).

An IEP is the main tool for ensuring that a student is provided a FAPE. *See Charles H.*, 2021 WL 2946127, at *1 (quoting *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 123 (D.D.C. 2013)). "'[A]ll political subdivisions of a State involved in the education of children with disabilities' must cooperate to ensure that disabled students receive [a] FAPE according to the terms of their IEPs." *Id.* (quoting 34 C.F.R. § 300.2(b)(1)). Thus, if a political subdivision materially deviates from a student's IEP, then it has failed to provide that student a FAPE. *Id.* at *2 (quoting *Holman v. District of Columbia*, 153 F. Supp. 3d 386, 390 (D.D.C. 2016)).

**B. Robles's early evaluations (2013–2014)**

In 2013, when Robles was ten years old, he received a psychological evaluation. *See* Administrative Record ("A.R."), ECF Nos. 5-1–6-3, at 32. His school wanted the tests done to determine if he required special education and related services under the IDEA. *See id.* It was not

the first time that Robles had undergone some form of evaluation. By this time, he had already been diagnosed with both ADHD and depression. *Id.* at 54. The 2013 evaluation, in contrast, would be more focused on Robles's academic struggles.

The evaluation was a mixed bag. It concluded that Robles's cognitive ability was within the average range, with his nonverbal reasoning being his greatest academic strength. *Id.* at 54. But it also concluded that he was behind in his verbal comprehension and word-processing speed, both of which were in the low-average range. *Id.* All told, the report found "that his intellectual capabilities are stronger than what is currently represented by his academic achievement." *Id.* at 55.

The evaluation also assessed Robles's social-emotional and behavioral functioning. *See id.* It found that he desired to do well in school. *Id.* But he struggled compared to his peers, at least in part by his having attended four different schools by age ten. *Id.* The evaluation concluded that Robles had a hard time regulating his emotions and was often overwhelmed with frustration. *Id.* This general anxiety was compounded by certain personal aspects of his life outside of school, beyond the control of any child. *See id.*

All told, the evaluation concluded that Robles "require[d] support to sustain his attention to effortful tasks, inhibit distracters and impulses and maintain an organized, consistent approach to learning and problem solving." *Id.* This "require[d] intervention to improve his attention and impulse[-]control skills, and thereby his availability to learn and succeed in the classroom." *Id.* The evaluation gave several concrete recommendations, *see id.* at 55–57, and the District of Columbia concluded that he was eligible for special education as a student with multiple disabilities, *see id.* at 59. It thus created an IEP to support his learning. *See id.* at 59–70 (2014 annual review). As of the fall of 2014, when Robles was in sixth grade, he was assigned seven-

and-a-half hours of specialized education outside of the general-education environment, plus two hours per month of behavioral-support services. *See id.* at 65, 67. The IEP specifically concluded that Robles's "emotional and behavioral needs can best be met in a small[-]classroom setting." *Id.* at 68.

### C. Robles's 2016 reevaluation

In 2016, three years after Robles's first comprehensive tests, the District of Columbia again found that he qualified for special education. *See id.* at 72–77. Robles stresses that no new formal evaluations were completed at this time. *See* Pl.'s Mot. for Sum. Judg. ("Pl.'s Mot."), ECF No. 8, at 2. It is true that he did not go through the same intensive evaluation that he did in 2013. But the school did create a thorough "Final Eligibility Determination Report," which concluded that he continued to need special education and related services. A.R. at 72–77.

The Final Determination relied on a review of "existing data provided by a group of qualified personnel," including both Robles and his mother. *Id.* at 75. It noted the results from the formal testing in 2013 and identified what progress, if any, he had been made in his schooling. *See, e.g.*, *id.* at 76. And it used samples of his actual schoolwork, along with classroom observations, to supplement its findings. *See id.* Plus, to assess his behavioral development, the school *did* conduct a new assessment, "The Gain Short Screener," in October of 2015. *See id.*

Based on this information, the 2016 Final Determination concluded that Robles continued to suffer from "Multiple Disabilities / Emotional Disturbance, Other Health Impairment." *Id.* at 72. It noted that these disabilities impacted his reading, written expression, and his "Emotional, Social, and Behavioral Development." *Id.* at 73. Part of this process included a meeting among Robles's mother, a special-education teacher, a social worker, a special-education coordinator, and a school-based psychologist. *Id.* at 74. All agreed with the Eligibility Determination Report. *Id.*

### D.  Robles's 2017–2018 Annual Review

Robles matriculated to high school the following year.  *See id.* at 8, 20.  That spring, an IEP Team again met to review and revise Robles's IEP as needed.  *See id.* at 92–111.  (Such "Annual Review[s]" were conducted every year.  *See, e.g.*, *id.* at 79 (2016–2017 Annual Review).)  As in years past, the Annual Review included a meeting among Robles's mother, a special-education teacher, a school representative, a general-education teacher, a social worker, and the lead special-education teacher.  *See id.* at 92.  The IEP was thorough, spanning close to twenty pages.  And it relied on diverse inputs, such as Robles's performance during the 2016–2017 school year, *id.* at 93; his performance during the 2017–2018 school year to that point, *id.*; reading/writing-assessment tests conducted in both the previous school year (the "WJ-IV") and the current one (the "SRI"), *id.* at 95, 96;[1] reports from his teachers, *id.* at 95–96, 98; and a Strengths and Difficulties Questionnaire from August 2017 and January 2018, *id.* at 98.  Based on these results, the IEP Team found that Robles needed eighteen hours per week of specialized instruction, plus ninety minutes per month of behavioral-support services.  *Id.* at 102.  It continued

---

[1] The reading tests determined that Robles's reading levels were at the "early 2nd grade level," but his English teacher thought this score did not reflect what he could and could not do in class.  A.R. at 95.  She did note, however, that Robles "continue[d] to require support in the classroom to complete reading and writing tasks," and that "he require[d] close supervision to ensure his best efforts."  *Id.*  As a result, he was "able to read a grade[-]level text when provided support in decoding unfamiliar words."  *Id.*  But the overall prognosis required more support: he still suffered from "significant deficits in both sight word fleun[cy and] his ability to decode. . . . While he has the prerequisite skills required to comprehend grade-level text, he is held back by fluency issues and word recog[nition] problems."  *Id.* (bracketed text inferred; original text unreadable).

As for his abilities in written expression, his English teacher noted that he was "able to write responses to grade[-]level prompts," but he "need[ed] the prompt broken down" so that what it "is specifically asking for is clear to him."  *Id.* at 96.  In addition, he "continue[d] to avoid written work that is on grade [level ev]en when he is able to verbalize his answers.  He struggle[d] to put his thoughts on paper and exhibits anxiety around spelling errors."  *Id.* (bracketed text inferred; original text unreadable).

to identify his least-restrictive learning environment as "outside general education classroom." *Id.* This is broadly consistent with the IEP updates made by the IEP team that following December, too. *See id.* at 137–56 (annual review conducted December 12, 2018).

### E.  Robles's 2018–2019 Annual Review

In December 2019, the IEP Team again met for Robles's annual review. *See id.* at 282–300. The same group of individuals attended, including Robles, his mother, a special-education teacher (who could also interpret assessment results), a special-educator coordinator and school representative, a general-education teacher, and a social worker. *Id.* at 282. The Team again considered a diverse range of materials, including Robles's academic performance, *id.* at 285, 286; teacher input, *id.* at 285, 286, 288; and a Strengths and Difficulties Questionnaire, *id.* at 288. Based on all that, the IEP Team continued to conclude that, "[d]ue to his specific learning disability," Robles had "significant deficits in both sight word fluency and his ability to decode." *Id.* at 285. Thus, while "he ha[d] the prerequisite skills required to comprehend grade-level text, he [was] held back by fluency issues and word[-]recognition problems." *Id.* This made him easily frustrated by reading. *Id.* As for writing, the report indicated that Robles "continue[d] to avoid written work that is on grade level, even when he is able to verbalize his answers." *Id.* at 286. He suffered severe anxiety about spelling errors, and thus would "often settle for providing incomplete sentences or one sentence responses [de]void of details." *Id.* As for his behavioral development, teachers noted that his behavior was "a major impact on his ability to obtain academic success[.]" *Id.* at 288. At the time of the report, his GPA was a 1.2, and he was receiving a "D" in Physics and English, plus an "F" in Automotive Technology. *Id.*

The IEP Team continued to assign eighteen hours per week of specialized instruction outside of general education, plus an hour each month of behavioral-support services. *Id.* at 291.

This was suggested to be accomplished, once again, through "[s]mall[-]group instruction and remediation," with "frequent breaks from activity." *Id.* at 292. The IEP further noted that Robles's learning disability, combined with his "distractibility, inattentiveness, and recently an increase in negative behaviors . . . are preventing him from successfully accessing the general[-]education curriculum." *Id.* at 288. And it explained that he seemed "to avoid participating in behavioral[-]support services, as his attendance and engagement with this social worker has been sporadic." *Id.*

### F. Robles's behavior-support services from April 2019 to May 2020

With regards to the assigned behavioral-support time, in 2019 Robles received thirty minutes in April,[2] an hour in May,[3] an hour in September, ninety minutes in October, forty-five minutes in November,[4] and an hour in December.[5] *Id.* at 224–29. In 2020, he received seventy-five minutes in January, two hours in April, and fifty minutes in May. *Id.* at 230–33.

### G. Robles's 2020 reevaluations

In September 2020, less than a year after his 2018–2019 Annual Review, Robles requested that he receive a full evaluation, like the one he had undergone in 2013. *See id.* at 325–26. The District agreed to his request. *See id.* at 346. Robles thus received a physiological reevaluation in November, *id.* at 439–67, and a speech-language evaluation and functional-behavior assessment

---

[2] School was closed for spring break, eliminating one of his sessions. *See* A.R. at 224.

[3] Robles was scheduled to have another thirty-minute session this month, but appears to have not attended. *See* A.R. at 225 ("Student unavailable as a result no BSS provided.").

[4] Robles was absent from school and missed a forty-five-minute appointment this month. *See* A.R. at 228 ("Student absent from school, as a result, no BSS provided.").

[5] Robles again missed a thirty-minute appointment this month. *See* A.R. at 229 ("Student absent from Science class, no BSS provided. Student was observed walking the halls.").

in December, *id.* at 469–75, 493–501; and the District developed a level-two behavior-intervention plan for him in January, *id.* at 512–16.

After those tests were conducted, the IEP Team met to review the evaluations and see if any revisions to Robles's IEP were necessary. *See id.* at 559–62. (Again, the process included a meeting among Robles, his mother, five special-education teachers, a special-education coordinator and school representative, a general-education teacher, and a social worker. *Id.* at 600.) As reflected in his new IEP, the IEP Team concluded that some changes were warranted. *See id.* at 564–85; 600–19. The changes, however, were modest. While Robles's ADHD diagnosis remained, for example, his emotional-disturbance diagnosis was dropped. *See id.* at 584, 600. And the IEP continued to conclude, for example, that Robles would "internalize his emotions" and "disengage in the virtual classroom setting[,] displaying a lack of initiative regarding starting classwork and completing homework." *Id.* at 602. It was "[t]hese concerns [which] prevent[ed] him from successfully accessing the general[-]education curriculum." *Id.* Further, Robles continued to "not consistently attend his [behavior-support-service] sessions." *Id.* But his participation had increased compared to the prior school year. *See id.*

In terms of specifics, the results of the new testing concluded that his reading level was below average, equaling an age-equivalent of 11.2. *Id.* at 603. (At this time, Robles was a senior in high school. *Id.*) The IED did note, however, that Robles "perform[ed] better with direct instruction utilizing a hands-on approach." *Id.* As for writing, the testing revealed that he fell within the "Average" range, but his performance varied depending on the task given. *Id.* at 606. And for his behavioral development, Robles had also made some gains: his teachers "conveyed that overall, [he] ha[d] made some gain this year, during virtual learning, as he has the ability to engage in the classroom setting without major distractions." *Id.* at 607. But he still struggled in

engaging in class discussions and completing his work.  *Id.*  This resulted in his report card reflecting two "D"s (in D.C. Government History and Probability & Statistics) and an "F" (in Spanish).  Overall, the IEP reduced his specialized instruction outside of general education to fifteen hours per week.  *Id.* at 610.  And it increased his behavioral-support services to ninety minutes per month.  *Id.*  Once again, the IEP concluded that Robles needed "[s]mall[-]group instruction, [and] frequent breaks from activity."  *Id.* at 611.

### H.  Robles's administrative due-process complaint

Unhappy with those results, Robles filed an administrative due-process complaint on April 15, 2021.  *See id.* at 627–52.  He believed that the District had denied him a FAPE in four ways:

- By failing "to evaluate in all areas of suspected disability and/or failure to conduct triennial evaluations in a timely manner, from 1/2016 to the present time," *id.* at 643;
- By failing "to develop an appropriate IEP from 12/0/2019 until the present time because the IEPs failed to provide an appropriate level of Specialized Instruction, did not place student in his [least-restrictive environment], did not provide appropriate goals, baselines, and because they were not populated by updated evaluations and/or assessments," *id.* at 644;
- By failing "to conduct, create, and implement an appropriate [functional-behavior assessment], appropriate and corresponding [behavior-intervention plan,] and/or appropriate safety time, from the time [Robles] started" high school, *id.* at 646; and
- By failing "to implement [Robles's] 12/12/2018, 12/10/2019 and 12/7/2020 IEPs with fidelity," *id.* at 648.

He sought various forms of relief, including compensatory education.  *Id.* at 642.

An administrative due-process hearing was held on June 17 and 25, 2021.  *Id.* at 768–847 (June 17), 848–1000 (June 25).  Many witnesses testified.  One was Marcus Palmer, the school psychologist for juniors and seniors.  *Id.* at 922.  He conducted regular reevaluations and triennial reevaluations for students.  *Id.*  As he explained it, the main purpose of the triennial reevaluation is answering whether the student is still eligible for services.  *Id.* at 923.  But such reevaluations also determine what modifications are needed to the student's IEP, or if there should be a change

in the student's classification.  On his experience, "it's not necessary to conduct an assessment for our triennial."  *Id.*  Instead, the team can look "at all previous and current data that [it has] on file for the student from all teachers and all parties involved."  *Id.*  But if there is a question about a change in disability, then a comprehensive reevaluation is necessary.  *See id.* at 924.

Palmer oversaw the November 2020 triennial reevaluation of Robles.  *Id.*  And in line with the above, Palmer reviewed prior assessments, progress reports, and other educational data, plus classroom observations, in formulating his conclusions.  *Id.* at 925.  He also testified about the District's decision not to conduct further testing in 2018:  "[T]he team decided at that time that due to current data that they had on file that no additional assessments were needed to continue [Robles] to be classified with the disability that he was classified with."  *Id.* at 927.

Another witness was Lisa Campbell, a social worker at Robles's high school and an expert in school social work.  *Id.* at 898–99.  She worked with Robles for four years, up until his graduation.  *Id.* at 899.  She found him to be a "very good student" and enjoyed watching "him grown into [a] matured young man."  *Id.*  But he was distractable.  *Id.*  She attributed this to his wanting to engage with his peers.  *Id.* at 900.  During the spring of 2019, however, she saw Robles making good progress, such as being able to sit through tests and acknowledging some shortcomings in his work.  *Id.* at 903, 906.  Campbell also noted that, during this time frame— April 2019 through June 2019—she did not "see anything that would have required" a functional behavior assessment, "because he was showing some improvement towards the end of the year." *Id.* at 907.[6]  That held true for the next year, too.  *Id.* at 910–11.  At the behest of Robles's parents

---

[6] Campbell also testified that functional-behavioral assessments are usually conducted only upon teacher request:  "Usually they're conducted—it's when a teacher has said that, you know, a student is exhibiting some behaviors that are impe[]ding them from succeeding in class—in the classroom setting.  It's a team discussion regarding the FBA.  And so it's a team approach when a[n] FBA is being considered."  J.A. at 907.

and attorney, however, Campbell did conduct a functional-behavior assessment for Robles that following December. *Id.* at 911.

Twana Culberson, the special-education coordinator at Robles's school, also testified as an expert in special education. *Id.* at 953–54. She began meeting with Robles in "September or so" of 2020. *Id.* at 954. At the hearing, she testified about his IEPs. *See, e.g.*, *id.* at 955. Specifically, she noted that, while Robles was able to perform grade-level work, "he required [a] smaller setting in order to do it." *Id.* at 956. In particular, he "required some support with words that he may not know"; once given that help, however, he could use "his context skills in order to . . . understand the material." *Id.* She also found the learning goals in his IEPs appropriate, an opinion she based off her thirty-three years in special education. *Id.* at 957. She reached a similar conclusion about the hours of special instruction he received outside of the general-education setting, too. *Id.* at 958–59; *see also id.* at 967 ("[H]e is a student who is capable of completing grade[-]level work. He just requires [a] small[-]group setting. He requires a smaller setting with less distractions so that he can receive the support necessary for his academic success.").

Culberson also explained what type of education Robles received outside of the general-education setting. Generally, students can be educated in two non-general-education settings: a self-contained setting or a small-group setting. *Id.* Robles received his hours in a small-group setting. *Id.* But his elective classes—like Spanish, auto-tech, art, and the like—were taken in the general-education setting. *Id.* at 977.

Robles also had his own witnesses testify. Dr. Natasha Nelson, an expert in clinical and school psychology, along with special-education programming, was among them. *See id.* at 829. She reviewed all Robles's previous evaluations and educational records. *See id.* at 830. Dr. Nelson noted that, based off his first formal assessment (the one from 2013), he had weaknesses in verbal

comprehension and processing speed, but strength in nonverbal reasoning. *Id.* at 831. And she noted that he suffered from anxiety and depression, in addition to ADHD. *Id.* at 831–32. Turning to his November 2020 evaluation, she explained that his results were roughly the same. *See id.* at 834–35. Overall, she believed that Robles "definitely" needed specialized instruction in reading and writing. *Id.* at 836. And she noted that he "struggles with distractions." *Id.* at 837.

Despite those conclusions, Dr. Nelson still found Robles's IEPs to be "restrictive." *Id.* at 840. For his 2018 and 2019 IEPs—the ones that required eighteen hours outside of the general-education setting—she thought more of his education could be had outside the small-group setting: "For a young person who has an average IQ, who has average math, and who could see some advancement with proper supports, I'm not sure why some of the services were not in a push-in format in the general[-]ed setting, so he could have more interactions with his peers[.]" *Id.* Based on that, she hypothesized that Robles perhaps could have been placed in a less-restrictive environment: "So I wonder if a less restrictive IEP was right and a less restrictive environment than 18 hours per week outside of general ed." *Id.* She especially thought this to be the case for math. *Id.* at 841.[7]

---

[7] Dr. Nelson gave a similar synopsis later in her testimony:

So from my review, the major behaviors we're looking at are behaviors related to ADHD and sometimes avoidance because of his diagnosis. So you're asking what kind of setting. When I think about setting, I'm thinking about placement, where should a child be placed to receive their services? His protocol and his whole set of disclosures to me did not suggest the need for a self-contained class, an IEP with 8 hours of specialized instruction outside of the general[-]education class, the behaviors did not suggest that he needed a very—an IEP that had a lot of hours for outside support outside of the general[-]ed classroom. Yes, he required behavior support which we have here on the IEP, so I would suggest that's what he needed."

A.R. at 841–42.

Another witness for Robles was Everick Gross, an expert in special education. *Id.* at 852. Gross met with Robles and reviewed his service trackers, report cards, and evaluations, including his psychological testing. *Id.* at 853. Many of his observations mirrored that of prior witnesses. He noted that Robles's 2013 reading scores were "not only below level, but significantly below level"—hovering in the sixth through eighth percentile on the relevant metrics. *Id.* at 855. Those scores remained low in 2020. *See id.* at 856. Despite this, Gross still thought that Robles "probably could have done with fewer hours of support.," or, at least, that Robles should have received different support, but in the general-education setting. *Id.* at 871. Gross also commented that he was surprised that no full-scale psychological evaluation was conducted in 2016; in his experience, "every 3 years we go back and we look at whether or not it is necessary to conduct a full battery of evaluations in determining whether or not a student continues to qualify as a special[-]education student." *Id.* at 873–74. All told, he recommended that Robles receive four-hundred hours of tutoring to close his gap in reading. *See id.* at 885. He attributed Robles's prior lack of growth in reading to Robles's being educated outside of the general-education environment. *See id.* at 894.[8]

---

[8] A section of Gross's testimony is particularly illuminating:

> MR. BANKS:  Okay.  So [Robles] could have used fewer hours on his IEP, but you want me to award 400 hours of tutoring?
>
> THE WITNESS:  Yes, to make up for the harm that was done.
>
> MR. BANKS:  And the harm that was done was?
>
> THE WITNESS:  Was . . .
>
> MR. BANKS:  Too much service and a more restrictive setting?
>
> THE WITNESS:  And a lack of being able to progress.
>
> MR. BANKS:  Which you attribute to being in a restrictive setting?

The remaining two witnesses were Robles and his mother.  Robles's mother gave a broad overview of her son's educational journey and struggles.  *See id.* at 795–811.  She specifically noted that she was concerned at first because of his troubles with reading, "which interfered with all of his academics."  *Id.* at 800.  She also explained her concerns with her son being in a "self-contained classroom," which distracted him.  *Id.* at 802.  Robles himself gave similar testimony. *See id.* at 812–25.  He explained how he took all his nonelective courses outside of the general school population.  *Id.* at 814–15.  And he noted that he found this small environment to be a barrier to his learning, as he found it hard to focus and concentrate in it.  *Id.* at 815.  While Robles thought this was particularly the case in math—a class he found "extremely easy," *id.*—he admitted that he had previously failed both algebra and trigonometry, and testified that he asked for tutoring help in mathematics, *id.* at 820.  He further noted that he had been accepted to two colleges.  *Id.* at 821, 825.

### I.  The hearing officer denies Robles's complaint

The hearing officer rejected each of Robles's claims.  *See id.* at 4–29.  As to the first issue— whether the District denied Robles a FAPE by not conducting a comprehensive psychological evaluation by 2019—the hearing officer explained that "the purpose of a triennial evaluation is to determine [a student's] continued eligibility for services, and to inform the determination of the appropriate content of the IEP."  *Id.* at 22.  Given the evaluations conducted in 2016, 2018, and 2020, the hearing officer asked "whether [Robles] ha[d] met his[ ] burden of proving that DCPS failed to conduct triennial evaluations adequate for their intended purpose."  *Id.*  He concluded that Robles had not.  *See id.*

---

THE WITNESS:  Correct.

J.A. at 895.

The hearing officer reached the same conclusion on the second claim—that DCPS failed to provide an appropriate IEP since December 9, 2019, by not placing Robles in his least-restrictive environment. *Id.* at 23. After discussing some relevant caselaw, the hearing officer explained his surprise that a student would be asking to be placed in a *less* restrictive environment. He noted that Robles "has cited no legal authority for the proposition that a less restrictive setting is more likely to confer educational benefit." *Id.* at 24. A similar fate met the third claim—that DCPS denied Robles a FAPE by not conducting a functional behavior assessment and behavior-intervention plan. The hearing officer explained that "FBAs are typically indicated where the student's behavior is persistent, physically and/or verbally aggressive, and/or impairs the ability of classmates to learn or the teacher to maintain order in the classroom. [Robles's] behavior did not rise to that level." *Id.* at 25. And so too with the final claim, that DCPS denied Robles a FAPE by not fully implementing his behavior-support systems. Not so, found the hearing examiner, who concluded the school was in substantial compliance with its obligations. *See id.* at 26. He specifically noted the dates that Robles did not attend his scheduled services. *See id.*

This suit—functionally an appeal—followed.

## II. LEGAL STANDARDS

"Although styled as motions for summary judgment, the cross-motions before the Court more accurately seek review of [the hearing officer's] administrative due process decision." *Herrion v. District of Columbia*, 2022 WL 2753461, at *5 (D.D.C. Feb. 15, 2022) (report & recommendation). Such review is written into the IDEA itself. The statutory text allows "any party aggrieved by the findings and decision" made during the administrative proceeding to "bring a civil action" about it. 20 U.S.C. § 1415(i)(2). The court then "receive[s] the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its

decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

"In a review of a Hearing Officer Decision . . . , the burden of proof is always on the party challenging the administrative determination, who must at least take on the burden of persuading the court that the hearing officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *S.B. v. District of Columbia*, 783 F. Supp. 2d 44, 50 (D.D.C. 2011) (quotations omitted).  Indeed, the Court must give the administrative proceedings "due weight," and recognize that "factual findings from the administrative proceedings are to be considered prima facie correct." *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982) and *Roark v. District of Columbia*, 460 F. Supp. 2d 32, 38 (D.D.C. 2006)) (alteration accepted). Still, in the IDEA context, less deference than normal will accompany the administrative decision. *See Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005).

Since no party has asked the Court to consider any evidence beyond the administrative record, the Court will treat the cross motions for summary judgment as motions for judgment based on the administrative record.  *See S.B.*, 783 F. Supp. 2d at 50.

### III. THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT ROBLES WAS PLACED IN HIS LEAST-RESTRICTIVE ENVIRONMENT

Robles's first challenge is that he was not placed in his least-restrictive environment, and that he was thus denied a FAPE.  *See* Pl.'s Mot. at 5–11.  Robles does not contend that he needed to be placed in a *more* restrictive environment—one which would have less distractions, and thus get him the FAPE he was entitled to.  Instead, he argues that his least-restrictive environment was

actually in the general-education pool, and that he should have been taken out of the small-group setting his IEPs mandated.  *See id.*  As noted above, the hearing officer rejected this argument.

Recall that Robles bears the burden of persuading the Court that the hearing officer was wrong.  *See S.B.*, 783 F. Supp. 2d at 50.  He attempts to do that by pointing to several bits of testimony from the hearing:

- His own testimony describing the small-group setting "as a 'barrier' and 'a struggle for me,'" Pl.'s Mot. at 7 (quoting A.R. at 815);

- His testimony that he found his assignments in math and science particularly easy, and that the lack of a challenge made him less motivated, *see* Pl.'s Mot. at 7;

- The opinion of Dr. Nelson, who did not understand "why some of [Robles's] services were not in a push-in format in the general ed setting," *id.* at 8 (quoting A.R. at 840);

- The testimony of Gross, who "had always thought that [Robles] should have more access to the general[-]education population" and that "support could have been given in the general[-]education classroom as opposed to him being set in what seemed to be a self-contained setting," Pl.'s Mot. at 8 (quoting A.R. at 871); and

- The testimony of his mother that he could not learn in his current environment, as it was too distracting, *see* Pl.'s Mot. at 8 (citing A.R. at 802).

With this evidence, he points out that the hearing officer briefly mentioned Dr. Nelson's opinion, but never mentioned Robles's own testimony.  *See* Pl.'s Mot. at 8–9.  Robles thus argues that the hearing officer "ignored" the evidence showing that Robles was harmed by being placed in a too-restrictive environment, *see id.* at 9, and that the hearing officer instead substituted his own judgment that a smaller group setting would help a student focus more than a larger one, *see id.* at 9–10.

While the Court agrees that the hearing officer would have been better off not making comments on his own views of educational policy, the Court finds that Robles has failed to meet his burden.  Indeed, even if the Court's review was *de novo*, the Court would affirm the hearing officer's conclusions on this point.

"The key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP it offered was reasonably calculated to enable the specific student's progress." *Z.B. v. District of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018). Here, the school was aware of many facts that made a general-education setting seem inappropriate—facts it explained in its IEP.[9] As one IEP explained, Robles "needs specialized instruction in remedial reading and writing that would be best delivered outside of the general[-]education setting because of his inability to self-regulate when he is frustrated." A.R. at 292. The testimony from the hearing backed this up. No one disputes that Robles has a difficult time with reading. While he can read at a grade-appropriate level, he requires significant one-on-one attention to do so. And all agree that his difficulty with reading can lead to serious frustration. As reading is a core part of all core classes—even math—the school had a reasonable basis to believe this was the least-restrictive environment in which Robles could be placed, and the environment in which he would have the best chances of succeeding.

On the math point in particular, the Court appreciates that Robles claimed that he found math easy and thought he was not being challenged enough. Indeed, the Court encourages him to continue to follow his passion for mathematics. But his testimony about the ease with which math came to him does not find support in the record that the school—and the hearing officer—had before it. To the contrary, Robles had failing grades in multiple mathematics classes at multiple times, and he even requested tutoring to help him with that subject.

---

[9] The IDEA requires the IEP to include "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class[.]" 20 U.S.C. § 1414(d)(1)(A)(i)(V).

Finally, Robles appears to argue that his case is like that of *L.H. v. Hamilton County Department of Education*, 900 F.3d 779 (6th Cir. 2018).  *See* Pl.'s Mot. at 7.  The argument is underdeveloped.  But regardless, the Court does not see enough similarities to find that case helpful.  *L.H.* involved a fifteen-year-old student with Down Syndrome.  *See L.H.*, 900 F.3d at 785.  Through second grade, L.H. was placed in general education, but had some special-education supports and services administered, as well.  *See id.*  But starting in third grade, his IEP Team suggested moving him to a different school, into a class of only special-education students.  *See id.*  The curriculum was questionable, with math and handwriting instructions, for example, coming "through his physical education (gym) class."  *Id.* at 787.  Plus, L.H.'s "new IEP did not tie L.H.'s academic goals to third-grade regular-education standards in any way."  *Id.*  Indeed, his suggested curriculum did not even involve homework, and none of his classmates were as advanced as him in either reading of the desire and ability to socialize with others.  *See id.*  As a result, L.H.'s parents moved him to a private school and sued.  *See id.*  And the Sixth Circuit ruled for them, finding that the new school and special-education-only class was not L.H.'s least-restrictive environment.  *See id.* at 791–96.

Robles's case is a far cry from that of L.H.'s.  To be sure, severity of facts should not dictate the outcome of a case under the IDEA.  But it is noteworthy that there are almost no facts with which one could analogize Robles's situation to that of L.H., beyond the relief that they seek.

### IV. THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT THE DISTRICT DID NOT DENY ROBLES A FAPE BY NOT CONDUCTING FULL EVALUATIONS FOR SEVEN YEARS

Robles next argues that the IDEA required the District to reevaluate him once every three years.  *See* Pl.'s Mot. at 11–15.  He notes that the IDEA's implementing regulations require a periodic reevaluation not more than once per year, but at least every three years.  *See id.* at 11 (citing 34 C.F.R. §§ 300.303(a)–(b)).  Since he did not receive any thorough psychological

evaluations between 2013 and 2020, he argues, he was denied a FAPE.  *See id.* at 12–13.  More specifically, he contends that "the Hearing Officer failed to consider the evidence that the Defendant should have conducted updated formal testing as part of determining him eligible and updating his IEP."  *Id.* at 13.[10]

The hearing officer did not err.  Pursuant to the implementing regulations, Robles's school needed only to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining whether the child is a child with a disability . . . and [t]he content of the child's IEP[.]"  34 C.F.R. § 300.304(b)(1).  It did just that.  In January 2016, for example, an IEP Team gathered and concluded that Robles remained eligible for special education.  *See* A.R. at 72–77.  They reviewed a formal SRI conducted the month prior, showing that Robles was able to read a fourth-grade-level text at a rate of 25 words per minute, and even then with only 81 percent accuracy.  *See id.* at 76.  They also reviewed work samples and conducted classroom observations, in addition to having talks with his teachers.  *See id.*  And, a few months prior, they conducted a "Gain Short Screener," which gave information relating to Robles's emotional, social, and behavioral development.  *See id.* at 76–77.  Based on all of this, the team concluded that Robles remained eligible for special education.  *See id.* at 72–73.

The same type of review occurred in December 2018, when the team again concluded that Robles was still eligible for special education.  *See id.* at 158–61.  They reviewed his progress

---

[10] While parts of Robles's brief read as if the only proper reevaluation that can be conducted under the IDEA are the thorough psychological testing he underwent in 2013 and 2020, he later walks that back.  *See* Pl.'s Mot. at 13 ("In analyzing the decision not to conduct formal evaluations for seven years, the Hearing Officer focused on the question of whether or not 'DCPS failed to conduct triennial evaluations adequate for their intended purpose' of determining the student's continued eligibility for services and the determining [sic] what the appropriate contents of the student's IEP was.  *See* A.R. at 22. . . . [T]he framing of this question is not incorrect[.]").

reports and a reading inventory conducted in the spring of 2018. *See id.* at 159. His current progress reports revealed grades ranging from "F" (in English II and Reading Workshop) to a single B (in Beginning Swimming). *Id.* He was receiving "C"s in his math and science classes: a "C+" in Geometry and a "C" in Chemistry. *Id.* As for the reading inventory, it revealed he was reading at a fifth-grade level—"significantly below grade level." *Id.* at 160. The team also reviewed Robles's First and Second Advisory Report Card and had him conduct a Strength and Difficulties Questionnaire. *See id.* And they again heard from his teachers. *See id.* at 161.

Robles nevertheless contends that the hearing officer failed to consider evidence suggesting that he needed more formal testing earlier. His primary argument is that, "[w]hen updated testing was finally conducted and reviewed, substantial changes were made to [his] IEP." Pl.'s Mot. at 13. True, his updated classification removed his "emotional disability," leaving in place his ADHD diagnosis, and his hours of instruction per week were reduced from eighteen to fifteen. But these are modest changes. Far more relevant is that the updated IEP determined that Robles should remain in a small-group setting for his core classes, each day of the week.

The removal of "emotional disability" is what Robles focuses most on. *See* Pl.'s Mot. at 13–15. He seems to argue that, had the District conducted its formal assessments earlier, this change would have occurred earlier. *See id.* But again, that is a difference with no impact. As discussed, the removal in the "emotional disability" classification had little-to-no impact on Robles's actual IEP.

## V. THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT ROBLES WAS NOT DENIED A FAPE BY NOT CONDUCTING AN UPDATED FUNCTIONAL-BEHAVIOR ASSESSMENT OR BEHAVIOR-INTERVENTION PLAN

Robles next argues that the hearing officer misunderstood when a student needs a functional-behavior assessment or behavior-intervention plan. *See* Pl.'s Mot. at 15–17.

Specifically, he notes that Lisa Campbell testified that functional-behavior assessments are usually conducted "when a teacher has said that, you know, a student is exhibiting some behaviors that are impe[ ]ding them from succeeding in class." *Id.* at 16 (quoting A.R. at 907). But the hearing officer explained that "FBAs are typically indicated where the student's behavior is persistent, physically and/or verbally aggressive, and/or impairs the ability of classmates to learn or the teacher to maintain order in the classroom." *Id.* (quoting A.R. at 25).

Whatever the differences between the hearing officer's opinion and Campbell's testimony, it does not help Robles. Even under Campbell's proposed test, nothing in the record suggests that Robles needed a functional-behavior assessment. Robles argues that he "did not master any of his IEP socio-emotional and behavior goals," and that he "engaged in off-task behavior, was inattentive, and, at times, was disruptive in the classroom." *Id.* But none of this shows that a teacher requested a functional-behavior assessment, let alone that a teacher reported such behaviors that required such an assessment or plan.

That threshold shortcoming aside, as other courts have held, "a behavior intervention plan is not necessary if a student's IEP otherwise adequately addresses his behavior issues." *Simms v. District of Columbia*, 2018 WL 4761625, at *14 (D.D.C. July 16, 2018), *report and recommendation adopted*, 2018 WL 5044245 (D.D.C. Sept. 28, 2018). Such was the case here. While Robles did exhibit troubling behavior in the classroom, his IEPs implemented strategies that showed continued success. The District discusses the relevant strategies identified in the IEPs, as well as Robles's growth, at length in its brief. Def.'s Opp. to Pl.'s Mot. and Cross Mot. for Sum. Judg. ("Def.'s Mot."), ECF No. 10, at 23–25. Notably, Robles does not try to engage with these examples and arguments at all. *See* Pl.'s Reply, ECF No. 13, at 8–9.

**VI. THE HEARING OFFICER DID NOT ERR IN CONCLUDING THAT THE DISTRICT DID NOT FAIL TO IMPLEMENT ROBLES'S REQUIRED BEHAVIORAL-SUPPORT SERVICES**

Robles's final argument is that the hearing officer failed to appreciate that the District failed to implement 40 percent of his required behavior-support services. But once again, the record does not support his argument.

The Parties agree on the relevant date range and the relevant hours required. Robles was to receive ninety minutes per month of behavior-support services from December 2018 to December 2019, and an hour per month from then until March 2020, for a total of 900 minutes. *Compare* Pl.'s Mot. at 19 (presenting the totals) *with* Def.'s Mot. at 25–27 (not contesting those totals). But as Robles points out, and the record supports, he received only 575 minutes from April 15, 2019 and May 29, 2020. *See id.*

Robles's math, however, tells only half the story. In April 2019, for example, Robles received only 30 minutes of behavior-support services, missing the extra 60 minutes because the school was closed for spring break. *See* A.R. at 222. In May 2019, he received an hour, missing the extra thirty minutes because he was "unavailable." *Id.* at 225.

The next school year tells a similar story. In September, he received sixty minutes; the school does not explain why he missed the extra thirty. *Id.* at 226. In October, he received his full ninety minutes. *Id.* at 227. But in November, he received only forty-five minutes, missing his other scheduled forty-five-minute sessions because he was "absent from school." *Id.* at 228.

Starting in December, the IEP shifted to requiring sixty minutes of behavior-support services per month, which he received. *See id.* at 229. (Robles was scheduled to get an extra thirty minutes that month but was absent from that meeting. *See id.*) In January, he received seventy-five minutes, an excess of fifteen minutes over the required amount. *See id.* at 230. He received no services in February and March of 2020—which the Court notes corresponds with the starts of

the COVID-19 pandemic in the United States—but received two hours in April, an hour above that month's allotted time.  *See id.* at 231–32.[11]  And in May, he received fifty minutes—ten minutes short of his allotted time.  *See id.* at 233.

All told, Robles thus missed three hours and forty minutes worth of service over this time.[12] But an hour and forty-five minutes of those missed services were due to Robles's having missed his scheduled sessions.  And another hour of that time was because school was closed for spring break.

The hearing officer concluded that, all things considered, the District "was in substantial compliance with its obligation to provide 90 minutes of BSS per month from April 15, 2019 to December 10, 2019, and 60 minutes per month from December 10, 2019 until May 29, 2020."  *Id.* at 26.  The Court agrees.  While Robles had a deficit of several hours over this roughly year-long period, nearly half that deficit was due to his missing previously scheduled sessions.  The school cannot be faulted for making good-faith efforts to provide the required services when Robles failed to attend on his own volition.  *See Wade v. District of Columbia*, 322 F. Supp. 3d 123, 134–35 (D.D.C. 2018).

While it is close, the Court concludes that Robles has failed to meet his burden of demonstrating that the hearing officer got this question wrong.  On this record, the hearing officer reasonably concluded that this constituted no "more than a minor discrepancy between the services

---

[11] Robles claims in his brief that he received only 105 minutes of behavior-support services this month.  *See* Pl.'s Mot. at 18–19.  The record does not back this assertion up.  *See* A.R. at 231–32; *see also* A.R. at 11 (hearing officer reflecting five sessions totaling two hours), *but see* A.R. at 26 (saying that "105 minutes" were provided).

[12] The record is unclear on whether services were required for June 2019.  This figure assumes that they were not.  Even if they were, however, it would not change the Court's conclusion.

a school provides to a disabled child and the services required by that child's IEP." *James v. District of Columbia*, 194 F. Supp. 3d 131, 139 (D.D.C. 2016).

*    *    *

For the foregoing reasons, the Court will deny Robles's Motion for Summary Judgment, ECF No. 8, and grant the District's Cross Motion for Summary Judgment, ECF No. 10. An appropriate order will follow.

DATE:  August 26, 2022

CARL J. NICHOLS
United States District Judge